All right, is the appellant ready to proceed? Yes, Your Honor. William Krueger for Officer Doyle. Appellee, ready to proceed? Yes, Your Honor. You may proceed. May it please the court. Justices, we worked together before on different cases. Justice King, you and I had a case that went to the U.S. Supreme Court once upon a time. Did you win or lose? I won that case. Did I lose? I don't think so. I hope we both won, Your Honor. But thinking back on that case, it reminds me of Laurel and Hardy. And Stanley, Laurel, Oliver, Hardy. And yes, I would tell you, this is just another fine mess I've put us into. And here we are. I don't quote many movies, but I did see that the Justice quoted Diehard and Justice Ho and Justice Grave. We've worked together before on cases. And unfortunately, those cases are back in front of the U.S. Court of Appeals again. With this case, it's a very unfortunate and lose-lose situation. There's a 15-year-old that's died. There's a police officer who's in prison for murder. The facts of this case, the important ones, are really not in dispute. The facts of this case, the setting of the stage, is really not in dispute either. This was a party that was being thrown April 29 of 2017. The hosts of that party, the attendees, appreciated a grave conflict between rival gangs. They made many, many different decisions to address those conflicts and to alleviate dangers that they knew and they appreciated. The parents, they said, if there's drugs, if there's alcohol, if there's disrespect, don't go to that party, come home. Every parent, at least Rhonda Washington and Odell Edwards, said that to the occupants of that suspect car that went out that evening. The attendees, they knew there was something that was going to happen. They knew there was trouble, that there was a high risk, a high potential. From the two to four minutes before the initial shots, you've got 14 people that migrate to an intersection suspecting some beef, some fight. You've got a party host that stands out on the yard looking. You've got Vidal Allen that runs an errand for someone, quote, somebody needed to go pick up something. And we've had, from the defense perspective, all kinds of trouble trying to find out who was there, what was said, and what was going on. But Jeremy Seaton, Eric Knight, and 12 others knew that something was going to happen. Vidal Allen comes from his errand, and for the first time that evening, when he gets back, he concocts an escape plan, and he tells everyone that he runs into from his group, he looks them up and tells them as he finds them that here's our escape plan. And again, they implement this escape plan two to four minutes before the shots are fired, the initial 12 shots. And the rival gang that shows up suspiciously parks allegedly right behind the suspect car that's at a stop sign. The rivals, they exit, they flex, they do things. Then they get back into their SUV. They did what, you said? Get back in. Flex was the word that was used by the teens. I don't know what that means, and they won't define it. But this rival gang, after they flex and get back into their SUV, they go down to the nursing home parking lot, and it just gets worse. But it's interesting, because seconds after the initial shots are fired, Officer Gross is out on the street looking for victims, looking for suspects, looking for evidence, and when he looks at the stop sign, there isn't a suspect car there. The suspect car is actually in the driveway with a small group around it when you first see it on Officer Gross' body cam. And then the suspect car starts to back away, back out. And literally, Officer Gross starts yelling at the suspect car. From approximately this distance, they are in an Impala. One of the windows is down. They are front to front. There's a flashlight that illuminates the people in the car. The only two folks with flashlights were the police officers that Maxwell Everett and Grant Stewart walked right by and are caught on body cameras. And when you ask Maxwell Everett if he recognizes anybody on the body cam, he does not. If you ask Maximus Everett if this is the suspect car identified in the Gross video, he says it is not, but it is the only automobile that can be suspect. And unfortunately, when four armed commands are made in point-blank confrontation that even the suspect occupants are saying they could hear and see from the back seat, the car continues backwards. And it becomes the entire focus of what seconds before was the initial shooting and what is now an active shooter situation, an unfortunate situation. We want to blame the officers.  The officers? No, just the one officer, and that's when the DA pressured the other officer and they changed their stories as set out in our briefing. You'll recall Gross says initially, that car is coming at me. I was in fear of my life. The training that we have is when you pull your gun, you must be in fear of your life. Gross changed his testimony when he was pressured, as did Chief Haber. But look at their depositions. Look at Comar's report. When we give them these nine escalating circumstances, they have to do the right thing. There was an officer convicted for the murder of this child. We'll stipulate that Roy Oliver was convicted for the murder of that child, and that is now almost 10 months at the Criminal Court of Appeals, the highest criminal court in the state of Texas. And there are many things that are wrong with that conviction that I bring up in the briefing, and that is undisputed by the plaintiffs. So yes, Your Honor, Justice Graves. Who are we here, who's trying to get qualified immunity right now in this case? The only officer that's been sued. Who is that? Roy Oliver. Okay, and that's the same one that was convicted? That's the same one. All right. I just want to make sure we're talking about the same person. And you'll see that based on the current and past law of qualified immunity, law of the Constitution, there is no clearly established law that says Officer Oliver committed a constitutional violation when confronted with these nine escalating things. But there is a murder conviction. So it's clearly established law that you don't get to murder people. No, Your Honor, I apologize. We're not here on the murder conviction. Oh, I know we're not here on that, but we can't pretend it didn't happen. No one is. All right. Dallas County has an unusual history with regard to murder convictions. And some of us from Dallas know and appreciate that history. You're telling me Dallas County has a history of convicting police officers in shootings? Is that what you're telling me? No, sir. I didn't say that at all. You'll agree with me that it's rare that a police officer gets convicted in an officer's shooting. I will agree, especially in situations like this. It's extremely rare, unbelievably rare, unfathomably rare. But there is no clearly established law that covers those nine escalating circumstances that are undisputed. There is no clearly established law. You'd agree, though, that under Tennessee v. Garner, you can't use deadly force just because somebody is fleeing. And I'm sorry, Justice Ho, I cannot understand what you said. You would agree, though, under Tennessee v. Garner, that the officer can't use deadly force just because somebody is fleeing. In those specific circumstances where there has not been any initial shots fired, where there has not been any vehicle threatening the officers, where there has not been any vehicle... Well, hold on, hold on. Just because shots have been fired by somebody somewhere doesn't mean the officer can fire at anybody else. What was the suspicion that, did the officer have any cause to believe that this car was the source of the danger? There are a lot of cars here in the video. Thank you, Justice Ho. As the officers exit, they yell to a Honda. Three times, stop, stop, stop. The Honda stops. They don't shoot that car. There's persons in the crowd that point at the suspect car that's backing away. Again, it's not in the location where the suspect occupants say it was. There's a mailbox been knocked down. It's in a driveway that's someplace else. There's individuals that are saying this is the car. With armed weapons, Gross, who is not guilty of any murder, points his weapon at this car and says, stop, stop, stop. Four times. Obviously this close and audible. What happens is... You're asking a lot of cars to stop. I'm sorry, Your Honor, what? You're asking a lot of cars to stop. Just two cars were involved. The first car, he asked three times, it stops. The second car, the suspect car, continues backing away, continues backing away, continues backing away. Why do you call it the suspect car? Because that became the focal point of that whole 52-second period of time that they had to review and figure out who may be injured, who may be committing deadly force crimes against those kids. The best that the court, district court, can say is there's no immediate threat in a car full of teenagers. And I'll just tell you now, any time you get anything full of teenagers, it's a problem. The state of Texas... I'm sorry, and therefore an officer can shoot at a car full of teenagers? It's a suspect car full of teenagers, Your Honor. It's a suspect car... I'm just pointing you back to you. I'm sorry, what? Go ahead. There is no immediate threat in this case because... That's what the court says, there's no immediate threat. And I'll just tell you, there's Texas law that says you can't have that many teenagers in a car. And then the car itself... No Texas law that says if you get up to five teenagers in a car, then you can shoot the passenger in the car. We agree, Your Honor. But there's plenty of Texas law that says if that car is the danger and continues to be a danger, that car may be fired upon. And we've got cases... How is it a danger? It's driving at a very slow speed, obviously trying to escape the officers, not trying to strike the officers. I get that it's not appropriate, they should listen to the order, but that's a fleeing felon pattern just like Tennessee v. Garner. They think that car is armed. They think that lives are in danger. They have pulled their weapons and trained those on the car. Based on what? Based on what? That's what I want... I think we're wasting a lot of time talking about things that don't matter. Tell me what is the evidence that the occupants of the car are armed and dangerous? Okay, the evidence that we have that the occupants of the car are armed and dangerous is there's been a shooting. Individuals have identified that car as containing occupants that are guilty of something. The car in the face of police officers that are plainly eliminated is retreating and then the car accelerates towards the officers. That's dangerous. How many shooting victims were there from what happened at that address that night? There was one, but there was a murder weapon... There was one shooting victim from that night? A murder weapon was used...  and there were two or three murders that led up to that confrontation. There was one shooting victim from the incident at that address that night? There was two or three murders that led up to that confrontation and there was one shooting victim. All right, Counsel, your time has expired. Thank you, Your Honor. Mr. Spaulding? Yes, Your Honor. You may proceed. May it please the Court, that's Spaulding on behalf of Odell Edwards and the estate of his son. Mr. Kruger presents a set of facts that are of his own making. There is nothing that Mr. Kruger said today that constitute the facts that were known to the officers and that gave rise to this incident. The record is clear. The officers had no knowledge of any gang activity going on in the area. The video is very clear. The officers are inside the house when they hear shots fired. When they leave the house, Officer Gross proceeds down Barron Drive towards Shepard. Officer Oliver goes to his car and grabs his semi-automatic rifle. There is no—Officer Gross, neither Officer Gross nor Oliver knew how the shots had been fired. They knew the general direction they had come from. They didn't know there was a car. They didn't know there was a number of individuals that were—however Mr. Kruger termed it—that had been in that parking lot. They didn't know where any of that came from. They weren't receiving information as they walked down the street. In fact, Oliver wasn't with Officer Gross when they walked down the street. He went back to get his rifle and then came down the street. Officer Oliver's position from the moment that he shot at this car as it was traveling away has always been that he was doing it because he was trying to protect Officer Gross. He did not believe that there was a gun in the car. He did not believe that there had been shots fired from the car. He has never said that. Mr. Kruger has said that. Mr. Oliver—Officer Oliver has never said that. This is the appeal of the denial of a summary judgment motion. The facts are constrained by those that were found by the magistrate judge and the district court. The magistrate judge— Let me ask this. Everything you've said, I accept. And frankly, the argument that I heard today, anyway, wasn't convincing from the other time. Here's my question. How is this case any different from Irwin v. Safiago? I'm sorry? I didn't hear what the last question was. How is this case—I'm sorry. How is this case any different from Irwin v. Safiago? Well, in Irwin v. Safiago, the officer was directly in front of the vehicle. And the vehicle was driving— No, I've seen the videos. If you look at the videos in both that case and this case, the officers are basically equally positioned. The car is turning, trying to pass the officer. The officer's sort of in front, sort of on the side. And the cars are clearly trying to go away. They're not trying to strike the officer. They're trying to flee the officer. In other words, they're both being felon fat pack. And in Irwin, I believe the panel said that there might be a violation of the Constitution, but it's not clearly established, and therefore QI should have been granted. Why are we not required to essentially reach the same result here? Because in Irwin—and I think—I've looked at the video in Irwin, and the video is different. The video is different than the video in this case. And it's different in the sense of Officer Oliver's and Officer Gross's position to the vehicle. And in this case, the officer—and this is pointed out in Irwin where it says this is significant. The position of the officer is significant because the projection— Are you trying to suggest—looking at the video in Irwin, are you trying to suggest that the officer in Irwin was in greater danger than the officer here? Yes. If you look at the video, that doesn't strike me as passing a lab test. Well, and that's—and those are facts. Those are facts that are guided by the underlying decision. And the facts in this case are that no one was in threat of this vehicle. There was no threat to the vehicle. Irwin may have been different, and there may have been— I'll give you that Officer Gross and Oliver here— I'll give you that Officer Gross was not under any serious threat any more than anybody standing on a sidewalk. My point is that's the exact same thing to be said in Irwin. No officer was under greater danger. And, Your Honor, I appreciate what Irwin says, but my read of— It doesn't sound like a video. Videos are very similar, other than that Katie Speicher was at night. And, obviously, there's a video shooting, but there's no connection, as you can find out. Well, and how I read Irwin is what Irwin said on the clearly established law prong of the test. And it said the significance is the projected path of Irwin's vehicle was in the officer's direction, or at least generally, and then it— Yeah, and that's exactly true here. Right here, they're pulling back, and Gross is there, and the car is turning. It's facing Gross, but it's turning away, clearly trying to escape, just like the car in Irwin. No, well, I would disagree with that contention on the facts and the video in this case. It's that the car is not traveling in the direction of either of the two officers. And that's what the magistrate judge and the district judge below determined, that there was no threat to these officers, that the vehicle was moving away. At the time that the shots were fired, Officer Gross was behind the vehicle. And every witness has testified to that. Even Officer Oliver in his criminal testimony acknowledged that by the time he fired the shots, Officer Gross was behind the vehicle. Those are significantly different facts than what exists in Irwin. And so if you're looking to the clearly established law, there's clearly established law based on, Your Honor mentioned— Judge, you mentioned earlier Tennessee v. Garner. This is a fleeing vehicle, and you don't have a right to use deadly force against a fleeing vehicle. And Lytle— Right, but I'm sure you know, courts repeatedly, the Supreme Court, repeatedly said that Tennessee v. Garner was way too general of a case to cite an AP1 case. Here's the one distinction I can see is, if I recall correctly, the shot in Irwin may have been a split second or two earlier than the shot here. But we are talking about, if I understand correctly, less than a second between the crash sound of Gross' pistol and the shots being fired by Oliver. This is a really fast time frame, isn't it? Well, first of all, the crash sound has never been relied on as a basis for Officer Oliver shooting at the vehicle. No, I understand that. I guess what I'm trying to say is, if the theory of distinguishing Irwin is a matter of half a second, I don't know that that's how QI works. Half a second difference is not much. I don't think the timing is necessarily the distinguishing feature in Irwin as much as the circumstances surrounding it and the position of the officers. I mean, the law is clearly established that when the vehicle is moving away from the officers, you don't have the right to use deadly force, where there's no immediate threat to anyone. And that's the determination here. Those are the facts that this Court is constrained by on this interlocutory appeal, is the vehicle was moving away from the officers. There was no threat to anyone at that time when he fired five shots with his semi-automatic rifle into the vehicle. And as I understand it, Oliver doesn't contend that the car posed a threat to him, to Oliver. No, he has never said that. His intention is he was looking to protect a fellow officer. That's correct. And that fellow officer said he didn't view the vehicle as a threat at that point. That is correct. In fact, and tellingly, he did not fire his gun. So I think those are the distinguishing facts, and these facts are, again, they're not the facts that Mr. Kruger has brought to this Court today. These are the facts that we're constrained by based on the district court and the magistrate judge's opinion. They will get to argue these facts and all of this stuff potentially at a trial of this case in front of a jury. But based on the facts as they are today, and these are all supported by the summary judgment record, there was no threat. There was no threat to anyone. You do not shoot at a moving vehicle if there is no threat to yourself, another officer, anyone else. That is clearly established in the law. In Santiago, the shots were fired at the driver? That's correct. Not the case here? Not the case here. The shots, Oliver didn't know who he was shooting at. Officer Oliver hadn't been with Gross. He didn't know who he was shooting at. He knew which side of the car he was shooting into, didn't he? Yeah, presumably. I mean, given the time constraints, he was shooting at a car. He didn't know who was in it. He didn't know how many people were in it. He didn't know what he intended to hit or not hit. I mean, bullets hit the nursing home across the street. I mean, this is a teenage party. Mr. Kruger says that any time you get teenagers together, that's the problem. That was not the problem in this case. The problem in this case was an officer that opened fire in the middle of a group of teenagers. Teenagers that are trying to leave this party, teenagers who are in their car when they hear gunshots behind them, they're trying to get out of there. And the next thing they know, Officer Oliver shoots Jordan Edwards in the head as they're trying to drive away. These facts, as Judge Graves, you pointed out, there's a murder conviction. They're not contesting the murder conviction. A murder conviction should not be entitled to qualified immunity. The law supports it. The facts that are before this court supports it. And we'd ask that the court affirm the denial of the summary judgment and let this case go back to trial. And if the court has no further questions, I'll concede the rest of my time. Thank you, counsel. Thank you, Your Honor. Rebuttal. Rebuttal. May it please the court. As best as we can from a civil standpoint, we contest that murder. As best as we can from a civil standpoint, we know without a doubt that .358 seconds transpired from the time that that window that sounded like a bullet shot from all the occupants in the car, all they heard was shooting. That .358 seconds transpired from Officer Gross being at that back window to the first shots from Officer Oliver in response. That for that length of the car, for it to go by at that amount of speed and time, that car would be traveling in excess of 15 miles an hour. Impossible from where it was backed up to where it was headed. An apologist can't do that. I was a teenager once, and I know that for a fact. But with regard to this case, when you say that the car was driving away from the video, that's impossible. From the bullet hole in the nursing home, that had to go from the rifle to the nursing home because of the type of load that was being used, a federal tactical urban load. You're agreeing that those are factual disputes. They were not disputed by the plaintiff. I don't know who is disputing those facts. Whether the car was driving away or whether it posed a danger to Officer Gross, those are facts that are in dispute, aren't they? Well, you have to take a de novo review as to the materiality. And the testimony about where the car was, I don't think you can get into that genuine dispute. But the fact that a bullet had to go across that hood and into the nursing home, you've got to take that and look at it. The fact that the second shot hits the passenger side pillar, you've got to look at that. The fact that the third shot actually catches Jordan Edwards, unfortunately, when he says, duck, get down, he moves to his left and gets between Vidal Allen, who Officer Oliver— Well, you spent the first half of your opening argument talking about facts, but it sounds like you're telling me now none of those facts are disputed and aren't worth— Not by the plaintiff. And what happens here, and just let me finish, is Jordan Edwards, when he leans forward and to his left, he gets between Officer Oliver and Vidal Allen. There's no testimony that Officer Oliver was shooting at Jordan Edwards. The left hand, the gunshot residue on the left hand, that's between the front passenger seat and the driver's console. No possible way for that to come—and the chemicals don't match. It didn't come from Oliver. There's a lot of facts. The .93 seconds that it takes to shoot those five shots in kind of a horizontal line, that's the only way you can do it. The DA has you shooting into the ground and the bullet not making any mark in the asphalt. That, Justice Graves, is undisputed. There is no mark from a six- to eight-foot shot into the asphalt there at that intersection to confirm that they were shooting at the back of the car, and there's no bullet holes in the back. There's plenty of constitutional cases from the front of the car, even unarmed cars, in the Northern District of Texas. And from the side of the car, even unarmed cars in the Northern District of Texas. That's during daylight, not after 12 shots were fired from murder weapons. This is a serious, serious situation. It's an unfortunate lose-lose situation. But there is a man who has lost everything, and we don't really appreciate what he had to go through just to run to that gunfight and how he has embraced a nightmare not of his own making. You recall, too, there's a parent that lost a child. That's exactly what I'm talking about. That's what you're talking about. That's exactly what I'm talking about. You're saying there's a man who's lost everything, and that's what you're talking about. It's a nightmare. Now, everybody's lost everything. Everybody. There is not a winner in this situation. That's what makes this so dire. This is the Hobson's choice that has been presented to this court over and over, and I've been here presenting it to the various justices that are sitting here today. We know and understand one another, Justice Graves. I respect you. I respect the job and the grave weight that you have to carry. But if we allow this to continue in the district court, then you said you contest the murder, and if we allow it to continue, you'll have an opportunity to contest. I've got that opportunity now, and that's why I'm contesting it. So the answer to my question, though, would be a yes. Yes, every day, all day, twice on Sundays. Thank you, Justice Graves. I appreciate it. All right. Thank you, Counsel. Thank you. We'll take the matter under advisement. That concludes our cases for the day. We are adjourned.